642 So.2d 234 (1994)
William COOK, Plaintiff-Appellant,
v.
DEWEY RUSK FLOORING, Defendant-Appellee.
No. 93-1643.
Court of Appeal of Louisiana, Third Circuit.
August 10, 1994.
Rehearing Denied October 11, 1994.
*235 Dorwan Gene Vizzier, Alexandria, for William Cook.
Mark Alan Watson, Alexandria, for Dewey Rusk Flooring.
Before KNOLL, THIBODEAUX and SAUNDERS, JJ.
SAUNDERS, Judge.
This is a workers' compensation case. Plaintiff-appellant, William Cook, appeals from the judgment of the hearing officer in favor of his employer, defendant-appellee, Dewey Rusk Flooring, wherein it was held that plaintiff was not entitled to further indemnity benefits. Cook was found to be entitled to continued medical treatment relating to his elbow injuries as ordered by Dr. John T. Weiss, his treating physician. The hearing officer did not find these elbow injuries disabling. The hearing officer also found Cook to be entitled to reimbursement of the difference between a temporary total disability weekly benefit rate of $190.67 and the rate actually paid Cook, $160.00 per *236 week, together with legal interest from date of judicial demand until paid.
After our review of the record and appellate briefs, we do not find that the hearing officer clearly erred in the findings of fact or as a matter of law and thus, we affirm.

FACTS
On June 15, 1987, Cook was helping his employer, Dewey Rusk Flooring, lay flooring in a new classroom building being constructed at Louisiana State University in Baton Rouge, Louisiana. While laying the flooring on a second floor stairwell landing, plaintiff lost his balance and fell off that landing to the first floor level. Cook fractured both elbows in the fall and was treated by Dr. Weiss, an orthopedic surgeon. Dr. Weiss released the plaintiff to light duty approximately two months later, on August 11, 1987, and defendant's workers' compensation insurer paid Cook temporary total disability benefits until August 30, 1987.
After the August 11th visit, Cook did not return to Dr. Weiss until November of 1987, at which time Dr. Weiss released Cook to full work duty. Cook saw Dr. Weiss again in February and then in May of 1988, at which time Cook complained of vague soreness. Dr. Weiss recommended that Cook return in six months if he continued to have problems.[1] The record reflects that Cook's medicals were paid in December of 1988 for treatment by Dr. Weiss through 1988.
No further claims for medical treatment or expenses were made by Cook until the filing of this disputed claim on June 12, 1990. Cook claims that he is entitled to additional medical treatment for complaints related to his neck, as well as supplemental earnings benefits.
The hearing officer found that Cook failed to prove that he is entitled to any further benefits, with the exception of medical treatment for the original injury to his elbows in June of 1987.

ASSIGNMENTS OF ERROR
The crux of this case hinges on whether the hearing officer erred in finding that Cook was not entitled to medical benefits for his neck pain. Further, we must look at whether the hearing officer properly found that plaintiff was not entitled to supplemental earnings benefits after August 31, 1987.

June 16, 1987May 1988:
Dr. Weiss, plaintiff's treating physician, first saw Cook June 16, 1987, and treated him for the fracture of the radial head in both elbows. Cook was seen again by Dr. Weiss on June 23 and 30, July 7 and 21, and August 11 of 1987, at which time Cook was told that he could return to light duty work and to come back in three weeks. He did not show up for his October 5, 1987, appointment but returned on November 9, 1987, at which time the left elbow had healed without problems, while the right elbow remained a little sore. At this time, he was released to full duty and told to return in three months. He returned on February 15, 1988, at which time Cook complained of some numbness in his left arm. Dr. Weiss sent him to Dr. Arsham Naalbandian, a neurologist, who saw him March 1, 1988. Dr. Naalbandian did a nerve conduction study and an EMG of the upper left extremity and cervical paraspinals. Dr. Naalbandian's examination revealed no abnormalities and was negative for any type of cervical or radicular problem, although he did find that the left ulnar nerve seemed a little sensitive. Cook's next visit to Dr. Weiss was in May of 1988. At this visit, Cook was sore but had good range of motion.

November 18, 1989/Shoulder Pain:
On November 18, 1989, one and one-half years after his last visit to Dr. Weiss, Cook went to the emergency room of Rapides Regional Medical Center at 3:00 a.m. and again around 6:00 p.m. complaining of pain in his right scapula muscle or shoulder area. His shoulder was x-rayed with negative findings and he was given a muscle relaxant and anti-inflammatory drugs. He was diagnosed as having a muscle strain. Cook did not return to Dr. Weiss, his treating physician at this time.
*237 As to the connexity between Cook's June 1987 elbow injury and November 1989 shoulder pain, the hearing officer found that "in view of his activities over the past sixteen months [prior to November of 1989] there is no way of relating these [November 18, 1989] spasms to his job injury of two and one-half years ago [June 15, 1987 to November 18, 1989]."[2]
The hearing officer found that these shoulder complaints, which first manifested in November of 1989, were unrelated to his job injury two and one-half years earlier, in June of 1987. Additionally, the hearing officer did not find Cook a credible witness stating that "this gentlemen will say whatever is necessary to obtain the results that he desires under any circumstances."

February 7, 1991/Neck Pain:
Cook was in jail from June 30, 1990, through January 28, 1991. Cook testified that he sought medical attention for his neck while in jail without success, although we note that he went to the hospital several times while in jail for an eye problem unrelated to this case. After his release from jail, Cook's attorney made him an appointment and he again saw Dr. Weiss on February 7, 1991. Dr. Weiss' notes reflect that Cook complained that he experienced pain in his left elbow, left arm and right neck base while in jail. This is Cook's first complaint of neck pain.
In support of his claim that he had injured his neck at the time of the accident, Cook testified that, on the day of the accident, his "chin was busted up and bleeding" and that the walk-in clinic "had put a butterfly stitch type thing in it here ... like a bandaid." By contrast, we note that the records of the Walk-In Medical Center, which Cook went to immediately after the accident, do not mention treatment of any cuts or abrasions to Cook's chin.
Dr. Weiss noted that Cook told him in February of 1991 that he had hit his chin on the concrete when he fell in June of 1987 and showed Dr. Weiss a "tiny little scar" on his chin. Dr. Weiss also noted that Cook had not mentioned any injury to his chin, when he examined him on June 16, 1987, the day after the accident. Dr. Weiss' notes make no mention of any complaint of neck pain until February 7, 1991.
Cook's February 7, 1991, visit to Dr. Weiss was his last. Dr. Weiss found the physical examination of Cook's neck unremarkable and the X-rays of Cook's neck taken February 7, 1991, all appeared quite normal with no instability. At this time, Dr. Weiss also x-rayed Cook's left elbow with normal results.
Dr. Weiss stated that Cook wanted his neck problem checked out. In an abundance of caution, he referred him to Dr. Hajmurad, a neurologist, to rule out nerve damage. Dr. Hajmurad found that plaintiff's symptoms correlated with mechanical pain and muscle spasm, rather than involving the "long track," i.e., the central nervous system or brain stem. Dr. Hajmurad scheduled an EMG and nerve conduction test and recommended an MRI. Dr. Weiss testified that he believed this workup would be negative.

Summary:
The failure of the defendant to pay for these tests forms the basis of this lawsuit. Plaintiff alleges that he is entitled to be furnished additional medical treatment or diagnostic procedures recommended by Dr. Weiss and Dr. Hajmurad, in addition to chiropractic treatment by Dr. Paul Roger, for his neck and shoulder complaints.
Based upon the evidence presented, we find no error in the hearing officer's finding that Cook failed to prove that his shoulder injury in November of 1989 and his neck pain, alleged to have commenced after June of 1990, were connected to his elbow injuries of June of 1987.
We note that after the accident of June 15, 1987, Cook had never mentioned any neck or shoulder problems during his treatment by Dr. Weiss in 1987 and 1988. In February of *238 1991, he complained of pain in his left scapula. At this time, he had very good range of motion in his neck and slight soreness on extremes. Dr. Weiss testified that degenerative arthritis or very early degenerative disc disease, due to trauma, would be the most common cause of plaintiff's complaints. However, Dr. Weiss continued by stating that if trauma had caused degenerative disc disease, he would expect neck pain to manifest within a few months of the injury and gradually progress. Additionally, he would expect that the X-rays would show some degeneration.
Dr. Weiss continued by testifying that it would be unusual for someone suffering from a neck injury severe enough to cause degenerative disease to be asymptomatic from June of 1987 to November of 1989. When asked if he would "relate the need for additional testing ... to investigation of the injuries that Mr. Cook ... may have suffered in that fall in June of 1987," Dr. Weiss testified, "yes, if you assume that he had no other injuries that could have hurt his neck at some time, yes."
Dr. Weiss, when asked again whether he would relate Cook's 1991 complaints to his original 1987 fall, assuming no subsequent trauma, stated:
"Correct. I mean you're dwelling on his neck. If you just do the tests I think they will be normal, and you can forget the neck. We know that he has elbow problems."
Dr. Weiss agreed with defense counsel that relating plaintiff's 1991 neck complaints back to 1989 or even further, back to 1987, was a dubious connection and was based upon Cook's report that he had not had any other trauma to the head.
The question as to the connexity between plaintiff's June 1987 elbow injuries and his much later neck and shoulder complaints is a question of fact to be decided by the hearing officer. Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App. 2d Cir.1991) succinctly sets forth the applicable legal principles at pages 1178-79, as follows:
"The claimant in a worker's compensation case has the burden of establishing his disability and its causal relation with the employment accident by a preponderance of the evidence. Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320 (La.1985); Gonzales v. Babco Farm, Inc., 535 So.2d 822, writ denied, 536 So.2d 1200 (La.App. 2d Cir.1988). Proof by a preponderance of the evidence is sufficient when the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. In order for the employee to recover, it must be determined that the employment somehow caused or contributed to his disability, but it is not necessary that the exact cause be found. Walton, and Gonzales, cited supra.

"A claimant's disability is presumed to have resulted from an accident if before the accident he was in good health, but commencing with the accident the symptoms of the disabling conditions appear and continuously thereafter manifest themselves, providing either that there is sufficient medical evidence to show there is a reasonable possibility of causal connection between the accident and the disabling condition, Allor v. Belden Corporation, 393 So.2d 1233 (La.1981); Lucas v. Ins. Co. of N.A., 342 So.2d 591 (La.1977), or that the nature of the accident, when combined with other facts of the case, raises a natural inference through human experience that such a causal connection exists. Haughton v. Fireman's Fund American Ins. Cos., 355 So.2d 927 (La.1978); Dunn v. Allen Pulpwood, 565 So.2d 516 (La.App. 2d Cir.1990); Patterson v. GNB Battery, Inc., 569 So.2d 640 (La.App. 2d Cir.1990); Walton, and Gonzales, cited supra.

* * * * * *
"The testimony of a worker's compensation claimant alone may be enough to prove a work-related accident if there is no other evidence sufficient to discredit or cast doubt upon the claimant's version of the accident and his testimony is corroborated by circumstances following the accident. Gonzales, supra, and cases cited therein.
"Whether the claimant has carried his burden of proof and whether the plaintiff's testimony is credible, are questions of fact *239 to be determined by the trier of fact. The standard of review of the trial court's conclusion is under the manifest errorclearly wrong standard. Patterson, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989). Great weight is given to the trier of fact's factual conclusions, reasonable evaluations of credibility, and reasonable inferences of fact. These will not be disturbed though we may feel our own evaluations and inferences are equally reasonable. Rosell, and Patterson, cited supra.

"If the evidence is evenly balanced, or shows only some possibility that a work-related event produced the disability or leaves the question open to speculation or conjecture, then the claimant fails to carry his burden of proof. The trial court may weigh the credibility of a claimant. Gonzales, Walton, Dunn, and Patterson, cited supra."

Under the facts presented, Cook is not entitled to the benefit of the presumption set forth above insofar as his neck and shoulder symptoms did not commence with the accident and continue thereafter. Conversely, Cook did not seek medical attention for his neck and shoulder complaints until February of 1991. Clearly, the hearing officer did not find plaintiff a credible witness and did not find that he had carried his burden of proof. We are not inclined to disturb this finding by the trier of fact.

Elbow Injury/Supplemental Earnings Benefits:
Finally, we find no error in the hearing officer's finding that, although Cook may have intermittent pain in his elbows, he is not entitled to supplemental earnings benefits.
After his injuries in June of 1987, Cook returned to light duty work in August of 1987. He was returned to full duty work on November 9, 1987, at which time he worked for defendant for several weeks at full duty, without complaints to his employer, until fired for sleeping on the job.
In December of 1989, he began work as a full-service gas station attendant and performed well until June 13, 1990, at which time his employment was terminated due to his incarceration. This job was described as medium manual labor.
Additionally, Cook worked from May of 1991 until January 27, 1992, doing heavy manual labor as a deckhand until he was terminated for misconduct. His supervisor, Captain Spell, testified that he performed his duties well and without complaint. These duties included lifting very weighty lines, up to seventy-five (75) pounds per foot and about seventy-five (75) feet of line with assistance, when the boat docked. Additionally, his duties included mopping, sweeping, chipping paint with a pressure gun and painting the boat. Captain Spell, also testified that Cook had never complained of pain or injury while working as a deckhand. He stated that if Cook had been physically unable to perform his job, he would have been aware of the problem, insofar as it would have been obvious while handling the heavy lines or ropes described above.
Finally, a functional capacity evaluation was performed by Eugene Noel, a licensed physical therapist. The results of this test indicated that Cook should be able to lift 50 pounds on a frequent basis; 100 pounds on an occasional basis; and 20 pounds on a constant basis. Pursuant to the testimony of Noel, a "frequent" basis is defined as 33% to 66% of an eight hour day, while an "occasional" basis includes up to 33% of an eight hour day. Finally, a "constant" basis constitutes 66% to 100% of an eight hour day. He did note that the testing did not take pain into consideration and that Cook did complain of increasing pain in the neck and arms during testing. Noel found that several of the tests which Cook took were considered unreliable or invalid, revealing that Cook had not put forth the maximum effort, possibly due to symptom magnification.
Entitlement to workers' compensation benefits is based on the claimant's ability or inability to earn wages. See Tassin v. CIGNA Ins. Co., 583 So.2d 1222 (La.App. 3d Cir.1991). Based upon Cook's employment history and accompanying testing set forth above, we find no error in the hearing officer's finding that Cook is able to engage in gainful employment. Supplemental earnings benefits are proper where a claimant is *240 able to work, but unable to earn wages equal to 90% or more of the wages earned at the time of injury. LSA-R.S. 23:1221(3)(a).
The hearing officer found that Cook's average weekly wage while employed by defendant was $286.00 per week or $6.50 per hour, based upon a 44 hours work week. Ninety percent of $286.00 is $257.40 per week. The record reflects that when Cook was working as a deckhand from May of 1991 until January 27, 1992, he was earning $50.00 per day or $350.00 per week. Therefore, our review reveals no error in the hearing officer's ruling that Cook has failed to prove that he is entitled to supplemental earnings benefits because he is unable to earn wages equal to 90% or more of the wages earned at the time of his injury.

TRAVEL EXPENSES
Plaintiff next alleges that the $13.00 per night paid to him by defendant for housing when the crew was working out of town should be included in the computation of his weekly wage thereby increasing his weekly indemnity payments.
Cook is correct that, as a general rule, fringe benefits paid an employee would be included in the calculation of wages earned at the time of the injury. As stated by Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989):
"In determining the amount of pre-injury wages an employee earned, "[a]ny money paid the employee which can be regarded as remuneration or reward for his services should be included in fixing his compensation, irrespective of whether or not the payment was in the form of wages." Malone and Johnson, 14 Louisiana Civil Law Treatise, Workers' Compensation § 324 at 93 (1980)."
Id., at pp. 1007-08; see also Hodges v. Sentry Ins. Co., 492 So.2d 193 (La.App. 3d Cir. 1986); Vaughan v. Insurance Company of North America, 482 So.2d 1014 (La.App. 3d Cir.1986).
An exception to this rule applies in cases of reimbursement for travel expenses. This principle was set forth in Malone and Johnson, 14 Louisiana Civil Law Treatise, Workers' Compensation § 324 at 95 (1980) as follows:
"The only deviation from these rules appears to be in the case of reimbursement to employees for expenses incurred due to travel. It has apparently been felt that such allowances amount only to a reimbursement for extra living costs made necessary by the job, and are not real and reasonably definite economic gains to the employee. This position was first taken in Louisiana in Barrilleaux v. Hartford Accident and Ins. Co., and affirmed in a later case.
There are not very many decisions in Louisiana on the point. Other jurisdictions tend to share Louisiana's view in this regard, though some will compare the allowance to the actual travel expenses and include as a wage any amount which constitutes actual gain to the employee."[3]
(Footnotes omitted.)
Cook's housing allowance was merely a reimbursement for extra living expenses made necessary by his job and was not an economic gain to him. Reimbursement for work-related expenses are not considered wages unless the reimbursement is greater than the cost of the out-of-town housing. In this case, the evidence revealed that the $13.00 per night housing allowance was based upon the actual cost of a motel room at $26.00 for two people for one night. As such, we find no error on the part of the hearing officer in not including this amount in Cook's weekly wages.

COSTS
By his final assignment of error, Cook alleges that the hearing officer abused her discretion in casting him with all costs of the trial proceeding. The basis of this contention is that because Cook was granted partial relief, i.e., payment of future medicals for elbow injuries and an increased weekly compensation rate for the period from June 15, 1987, through August 31, 1987, he is, *241 therefore, a prevailing party and should not be liable for costs. In the alternative, Cook argues that he should be responsible for only a portion of the costs.
Under both general civil provisions and specific workers' compensation statutes, the grant of costs is discretionary with the court or hearing officer. See LSA-C.C.P. art. 1920; LSA-R.S. 23:1317(B); See Smith v. Two "R" Drilling Co., Inc., 606 So.2d 804 (La.App. 4th Cir.), writ denied, 607 So.2d 560 (La.1992).
Our research has revealed only one case involving a similar issue. In Gardner v. Normal Life, Inc., 542 So.2d 823 (La.App. 3d Cir.1989), a nurse's aide suffered an on-the-job injury in April of 1985 and received weekly benefits until February of 1987. The trial court denied plaintiff's primary claim of permanent partial disability, but did award her $1,250.00 for reimbursement of a tuition loan, in connection with educational rehabilitation, and medical expenses for an unpaid physical therapy bill, along with applicable statutory penalties and $350.00 in attorney's fees. The trial court assessed the plaintiff with three-fourths (¾) of the court costs, with the remaining one-fourth (¼) to be paid by the defendants. The trial court relied on LSA-R.S. 23:1320 which allows the trial court, in a workers' compensation proceeding, to assess court costs against a party who brought suit if the trial court finds that proceedings have not been brought upon reasonable grounds. The trial court in Gardner stated in its reasons that the plaintiff's claim for permanent partial disability benefits was groundless.
In Gardner, we amended the trial court judgment to cast the defendants with all costs both at the trial level and on appeal on the basis that the trial court erred in finding that plaintiff's principal claim was groundless. We found that plaintiff's suit was prosecuted on reasonable grounds, although we found no clear error in the trial court's finding that plaintiff could return to work. We also took note of the fact that sums were due and owing plaintiff for a tuition loan, physical therapy, penalties and attorney's fees.
We find the facts in Gardner distinguishable from the facts in this case. Cook did not prevail on his claim for medicals pertaining to his neck and shoulder complaints. He also was not the prevailing party on his claim for temporary total disability or, in the alternative, supplemental earnings benefits beginning in September of 1987 and continuing after the trial in October of 1992. These demands were clearly the main focus of the case.
Although the payment of future medicals for Cook's elbow problem was ordered by the hearing officer, the record does not reveal that the defendants refused treatment for plaintiff's elbow problem or that any treatment has been found necessary. Unlike Gardner, Dr. Weiss' bill reflects that the medicals were paid in full by defendants except for plaintiff's last visit on February 7, 1991. Although this examination did include an X-ray of plaintiff's left elbow, this visit appears to be primarily consisting of an examination and X-rays of plaintiff's neck and left shoulder. The subsequent medical treatment by plaintiff's chiropractor, Dr. Roger, was solely for treatment of his neck and shoulder complaints.
As to the other issue upon which Cook "prevailed," i.e., the adjustment of Cook's weekly compensation payments from June 15, 1987, through August 31, 1987, plaintiff's "Claim Data" form states that Cook was paid $160.00 per week, based upon a weekly wage of $240.00. The trial court found that plaintiff's weekly wage was actually $286.00 per week and ordered defendants to reimburse the amount between the $190.67 weekly benefit owed and $160.00, approximately $30.00 per week or a total of approximately $300.00 for ten (10) weeks.
LSA-R.S. 23:1320, utilized in Gardner and requiring a finding that the plaintiff's claim is groundless, is not the only basis upon which the hearing officer may cast a claimant with costs. As mentioned above, both LSA-C.C.P. art. 1920 and LSA-R.S. 23:1317 grant the court discretion in setting costs. The general rule remains as stated in Guardalabene v. Tenneco Oil Company, 246 So.2d 708 (La.App. 4th Cir.1971):
"We know of no difference between workmen's compensation cases and other cases *242 regarding imposition of costs.... Under our present law (LSA-C.C.P. Art. 1920) the trial court ` * * * may render judgment for costs, or any part thereof, against any party, as it may consider equitable.' Clearly, imposition of costs on the losing litigant in the instant case is not an abuse of the discretion enjoyed by the trial judge under the present article."
Id. at 710.
Apparently, the hearing officer found that those issues as to which Cook "prevailed" were not sufficiently significant to require allocation of court costs between the parties to retain fairness. We find no clear abuse of discretion in this finding, based upon the particular facts of this case. Thus, we find no merit in this assignment of error.

CONCLUSION
For the foregoing reasons, the judgment of the hearing officer is affirmed. Costs of this appeal are assessed to plaintiff-appellant, William Cook.
AFFIRMED.
NOTES
[1] He was not seen again by Dr. Weiss until February of 1991.
[2] The activities to which the hearing officer was referring were Cook's convictions for aggravated assault and discharging a firearm entered September 20, 1988, arising out of activities on July 30, 1988; a guilty plea entered August 6, 1990, for two counts of distribution of marijuana taking place on or about June 15 and 28, 1989; and a guilty plea entered March 5, 1990, arising from a charge of possession of stolen jewelry in excess of $500.00.
[3] Barrilleaux v. Hartford Accident and Ins. Co., 12 So.2d 611 (La.App. 1st Cir.1943); Price v. Houston Fire & Cas. Ins. Co., 155 So.2d 213 (La.App. 3d Cir.1963).